1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALFRED KISTENMACHER,<br><br>                    Plaintiff,<br><br>          v.<br><br>JOSEPH LEHMAN *et al.*,<br><br>                    Defendants, | Case No.  C04-5825RBL<br><br>REPORT AND<br>RECOMMENDATION<br><br>**NOTED FOR**:<br>**April 14ᵗʰ, 2006** |

        This 42 U.S.C. § 1983 Civil Rights has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4. Before the court is defendant's motion for summary judgment. (Dkt. # 29). Plaintiff contends he had a liberty interest in release on his earned early release date and was entitled to due process prior to a decision not to release him. (Dkt. # 6). Plaintiff has not responded to the motion for summary judgment. Pursuant to Local Rule 7, plaintiff's failure to respond is considered as an admission the motion has merit.

        Plaintiff named as defendants, Joseph Lehman, former Secretary of the Department of Corrections, Victoria Roberts, Chair of the End of Sentence Review Committee, and Kimberly Acker, Civil Commitment Program Manager. (Dkt. # 29 page 1 and 2). Mr. Lehman was never served and has not waived service. (Dkt. # 29, page 1 and 2).

1

<u>FACTS</u>

2

Plaintiff has not contradicted defendants facts which are adopted as follows:

3
4
5
6
7
8
9
10

Alfred Kistenmacher was previously in the custody of the Washington State DOC pursuant to the lawful judgment and sentence of the Lewis County Superior Court. On September 21, 1995, Mr. Kistenmacher was found guilty by a guilty plea of two counts of First Degree Rape of a Child. Exhibit 1, Declaration of Virginia Shamberg, Attachment A, Judgment and Sentence in <u>State v. Kistenmacher</u>, Lewis County Superior Court Cause No. 95-1-00247-6. The trial court imposed a time period of 78-102 months confinement for the first count, and 78-102 months for the second count of First Degree Child Rape. In his judgment and sentence, Mr. Kistenmacher was also sentenced to a community placement term. Exhibit 1, at 6. In 1995, the year in which Mr. Kistenmacher was sentenced by the Lewis County Superior Court to his term of community placement, a standard condition of community placement included the requirement that the residence location and living arrangements of Mr. Kistenmacher as a sex offender would be subject to the prior approval of the DOC during the period of community placement in his case. Id.  Mr. Kistenmacher earned early release date was April 6, 2003. Exhibit 2, Declaration of Cherrie S. Kollmer, Attachment A, Legal Face Sheet. Mr. Kistenmacher's sentence expired on July 14, 2004. Id.

11
12
13
14
15

Mr. Kistenmacher was released from DOC custody on July 14, 2004. <u>See also</u> Exhibit 3, Declaration of Stefanie J. Weigand, Attachment A, Deposition Transcript of Alfred Kistenmacher, Page 9 Lines 1-8.[1] Mr. Kistenmacher was released to the Lewis County Sheriff's pursuant to paperwork dealing with possible commitment as a sexually violent predator. Dep. Transcript 9: 16-20. Mr. Kistenmacher was not referred for possible civil commitment by the End of Sentence Review Committee. Exhibit 4, Declaration of Kimberly Acker, at ¶2. Mr. Kistenmacher was referred by the Attorney General's Office. Id.; Exhibit 4, Attachment A, June 30, 2004 –July 14, 2004 chrono entries. Mr. Kistenmacher is currently a resident at the Special Commitment Center (SCC), a Department of Social and Health Services facility on McNeil Island. Dep. Transcript 6: 13-14.

16
17
18
19
20
21

Inmates who have a community custody requirement in their judgment and sentence and are required by law or their judgment and sentence to have a release plan approved by DOC, may be released to community custody on or after their earned early release date only if their release plan is approved by DOC and the statutory notification requirements for the release of such offenders are satisfied. Exhibit 5, Declaration of Kathryn Bail at ¶ 9. Under DOC policy 350.200, an inmate's transition into the community on community custody status is premised on the inmate submitting a proposed release plan, including a proposed release address, which does not violate the conditions of the inmate's judgment and sentence, does not place the inmate at risk to re-offend, and does not present a risk to victim safety or community safety. <u>Id</u>. at ¶ 11. <u>See also</u> Exhibit 5, Attachment A, DOC Policy 350.200.

22
23
24
25
26

The process for an inmate to secure DOC approval of a release plan in order to be released to community custody is contained in DOC Policy 350.200. <u>Id</u>. at ¶ 10. DOC policy 350.200 is available to all inmates. <u>Id</u>. In determining whether an inmate's proposed plan to release to community custody is acceptable, DOC staff conduct a review of all relevant documentation, including, but not limited to, the inmate's judgment and sentence, field files, classification documents, psychological/psychiatric and forensic psychologist reports, the inmate's assigned risk management classification, and the inmate's criminal history summary. <u>Id</u>. at ¶ 12.

27
28

---

[1](Foot note 2 in original text)  Throughout the remainder of this memorandum all references to the Deposition of Alfred Kistenmacher will be in the following format Dep. Transcript: Page number(s); line number(s).

The Community Corrections Officer (CCO) will assess the degree of risk for victims and potential victims of similar age or circumstances when investigating the proposed release plans for sex offenders. Id. See also Exhibit 5, Attachment A, at 10-11; Exhibit 5, Attachment B, Dutcher Decision Memo dated February 12, 2003. A release plan will be denied if the classification Counselor or CCO determines that the plan will place the offender in circumstances where there is a likely risk to reoffend. Exhibit 5, at ¶ 14.

DOC staff investigate the inmate's release plan by visiting the proposed residence and by interviewing the person or persons with whom the inmate proposes to reside. Id. The investigating DOC staff then decide whether to approve or deny the inmate's release plan and communicate that decision to the inmate's counselor. Id.

If an inmate's release plan is denied, inmates are advised of DOC's decisions regarding release plans Id. at ¶ 13. The inmate may then submit a new or revised plan for DOC's review. Id. at ¶ 14. If the inmate is ultimately unable to locate a viable release address or all of the inmate's proposed plans for possible transfer to community custody status are denied, he/she shall be released on the date his/her maximum sentence is reached. Id. Counselors continue working with inmates up to their maximum release date encouraging inmates to find the best possible place for them to go, even though once inmates have reached their maximum release date, they must be released from DOC custody without regard to their plan. Id.

On or about February 28, 2003, Mary Rehberg was assigned to investigate a Community Release Referral (CRR) that had been submitted by Mr. Kistenmacher. Mr. Kistenmacher had proposed that he be released to his brother and sister-in-law's house in Sultan, Washington. Exhibit 6, Declaration of Mary Rehberg, at ¶ 2. Detective Coleman and Ms. Rehberg went to the brother and sister-in-law's home on March 11, 2003. The brother gave them a walk through of the basement where Mr. Kistenmacher would have his room, which was ready for him to move into. Id. at ¶ 3. Then while they were discussing the release plan the sister-in-law indicated they needed an additional 2-3 weeks to get a surveillance system set up. She also said she has sought counseling because "I am at my wit's end over this." Ms. Rehberg stressed the importance of safety and stability for all involved. She asked why they didn't get the security system going sooner and was told by the brother that it had not been an issue until recently when their car had been vandalized. Id. at ¶ 3; Exhibit 6, Attachment A, February 28, 2003- March 12, 2003 chrono entries.

On March 11, 2003, Ms. Rehberg called her supervisor, Community Corrections Supervisor Sandra Silver, and briefed her on the home visit she made to Mr. Kistenmacher's proposed release address. Id. at ¶ 4. She expressed her concerns about this release plan potentially providing an unsafe environment for Mr. Kistenmacher based on the need for a security system, recent vandalism, and the enemies the brother and sister-in-law already have in the community. She also expressed concerns about whether this would be a good placement for Mr. Kistenmacher considering the sister-in-law's stress level and her comment about being "at my wit's end over this." Id. at ¶ 4; Exhibit 6, Attachment A.

Ms. Silver had a conference call on March 11, 2003 with Mr. Kistenmacher's proposed residential sponsor, Loretta Kistenmacher. Exhibit 7, Declaration of Sandra Silver, at ¶ 3. Exhibit 7, Attachment A, March 11, 2003 chrono entries. Loretta made a number of comments which concerned Ms. Silver. On that same date, Ms. Silver met with acting Field Administrator Rick Rosales and Regional Administrator Dennis Thaut to discuss her concerns. She explained that Mr. Kistenmacher may be releasing to a very unsafe environment based on Loretta's comments about needing a perimeter security system and the "harassment" they have experienced. Mr. Rosales and Mr. Thaut indicated that they shared these concerns and supported denying the release plan. Id. at ¶ 3.

The release plan was denied based on concerns that it would likely place Mr. Kistenmacher at risk to violate the conditions of supervision. Id. at ¶ 4. Most importantly, it

would place Mr. Kistenmacher in an unsafe environment. Id.; Exhibit 7, Attachment A; See also Dep. Transcript 11: 2-25.

On or about June 12, 2003, Ms. Rehberg was assigned to investigate another CRR Mr. Kistenmacher had submitted. Mr. Kistenmacher had proposed a release address in Snohomish where he would be living with Asa Henry, a Level II Sex Offender. Exhibit 6 at ¶5. On June 13, 2003, Ms. Rehberg spoke to Michelle Rose the owner of the house in Snohomish who indicated that she was not going to sell the home and has decided to go ahead with the plan to rent it to Mr. Kistenmacher, a Level III Sex Offender. Id at ¶ 6. On June 24, 2003, Ms. Rehberg left a voice message for Michelle indicating that she had received Mr. Kistenmacher's rent money and it was ready for pick up.

On July 1, 2003, Ms. Rehberg received a call from Asa Henry indicating that Michelle told him it was just not going to work having offenders living in the house. Id. at ¶ 7. She only stayed in Arizona one day and decided to come back. She was also considering selling the house again. Based on this new information Ms. Rehberg met with Mr. Kistenmacher on July 2, 2003 and advised him that she was having to pull his proposed Snohomish address because the landlord was not going to rent the house. Exhibit 6, Attachment B, June 12, 2003-July 2, 2003 chrono entries.

According to Mr. Kistenmacher's sworn testimony, he also submitted a release plan to his mother's house. Dep. Transcript 12: 1-7. The plan was denied because there was a school within line of sight from his mother's house. Dep. Transcript 12: 8-11. Because Mr. Kistenmacher was convicted of First Degree Rape of a Child, his judgment and sentence does not allow him to be in the proximity of children. Dep. Transcript 12: 12-19. See also Exhibit 1, Attachment A. Mr. Kistenmacher also testified that he submitted another plan to live with a Level III sex offender in the Seattle area. The plan was denied because there were children in the area. Dep. Transcript 12: 20-25; 13: 1.

According to the Plaintiff, two weeks before his maximum release date, a therapist or someone working for DOC found him a possible place to live in Everett. Dep. Transcript 14: 6-13. This plan was approved on July 1, 2004, and the statutorily required notice requirements were begun. Exhibit 4, Attachment A. See also Exhibit 4, at ¶ 2 - ¶ 4. Mr. Kistenmacher was released from DOC custody on July 14, 2004. Exhibit 2, Attachment A.

(Dkt. # 29, pages 2 through 7).

Washington State's complex sentencing system allows some inmates to earn time off their sentence by programing and good behavior while incarcerated.  Other inmates, like Mr. Kistenmacher, may not earn time off their sentences but instead may become eligible for placement in a community under supervision in lieu of earning good time or earned time.

RCW 9.94A.728 (2) provides:

No person serving a sentence imposed pursuant to this chapter and committed to the custody of the department shall leave the confines of the correctional facility or be released prior to the expiration of the sentence except as follows:
...

(2)(a) A person convicted of a sex offense or an offense categorized as a serious violent offense, assault in the second degree, vehicular homicide, vehicular assault, assault of a child in the second degree, any crime against persons where it is determined in accordance with RCW 9.94A.602 that the offender or an accomplice was armed with a deadly weapon at the time of

commission, or any felony offense under chapter 69.50 or 69.52 RCW, committed before July 1, 2000, may become eligible, in accordance with a program developed by the department, for transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section;

(b) A person convicted of a sex offense, a violent offense, any crime against persons under RCW 9.94A.411(2), or a felony offense under chapter 69.50 or 69.52 RCW, committed on or after July 1, 2000, may become eligible, in accordance with a program developed by the department, for transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section;

(c) The department shall, as a part of its program for release to the community in lieu of earned release, require the offender to propose a release plan that includes an approved residence and living arrangement. All offenders with community placement or community custody terms eligible for release to community custody status in lieu of earned release shall provide an approved residence and living arrangement prior to release to the community;

(d) The department may deny transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section if the department determines an offender's release plan, including proposed residence location and living arrangements, may violate the conditions of the sentence or conditions of supervision, place the offender at risk to violate the conditions of the sentence, place the offender at risk to reoffend, or present a risk to victim safety or community safety. The department's authority under this section is independent of any court-ordered condition of sentence or statutory provision regarding conditions for community custody or community placement;

When an inmate is first transferred to the Department of Corrections, staff at the Department calculates at least three possible release dates for the inmate. The first of these dates is the maximum release date. A maximum release date is the date an inmate will be released because they have served the entire sentence imposed. The second date is an earned early release date, ERD. This is the date an inmate may be released if they earn all available sentence reductions and do not lose earned time for misbehavior. Release on this date is not automatic for all inmates. The third date the department calculates is an adjusted release date. This is the projected date when an inmate may be eligible for release if they lose no further good time or earned time. This date along with the earned early release date changes when an inmate does not earn or loses a possible reduction in their sentence. By statute an inmate cannot receive earned early release credits before they have been earned. "The correctional agency shall not credit the offender with earned release credits in advance of the offender actually earning the credits." See, RCW 9.94A.728 (1).

Certain classes of inmates have periods of supervision at the end of their incarceration. These inmates are not allowed to earn earned early release because of the nature of their crime. These inmates receive supervision by way of community placement or community custody "in lieu of" earned early release. Plaintiff is a person whose Judgment and Sentence included community placement or community custody following

1  release.  Defendants contends plaintiff were not entitled to general release on his earned early release date.

2  Plaintiff has not come forward with any evidence to contradict this assertion.  Thus, this action deals with an

3  inmate who reached his earned early release date and was not released on that date because  community

4  custody or community placement was imposed in the Judgment and Sentence.

5  DISCUSSION

6  A.      The standard of review.

7  Pursuant to Fed. R. Civ. P. 56 (c), the court may grant summary judgment "if the pleadings,

8  depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that

9  there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

10  law."  Fed. R. Civ. P. 56 (c).  The moving party is entitled to judgment as a matter of law when the

11  nonmoving party fails to make a sufficient showing on an essential element of a claim on which the

12  nonmoving party has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

13  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a

14  rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

15  475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not

16  simply "some metaphysical doubt.").  See also Fed. R. Civ. P. 56 (e).  Conversely, a genuine dispute over a

17  material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge

18  or jury to resolve the differing versions of the truth.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253

19  (1986); T. W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 630 (9th Cir.

20  1987).

21  The determination of the existence of a material fact is often a close question.  The court must

22  consider the substantive evidentiary burden that the nonmoving party must meet at trial, e.g. the

23  preponderance of the evidence in most civil cases.  Anderson, 477 U.S. at 254; T.W. Elec. Service Inc.,

24  809 F.2d at 630.  The court must resolve any factual dispute or controversy in favor of the nonmoving

25  party only when the facts specifically attested by the party contradicts facts specifically attested by the

26  moving party. Id.

27  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial,

28  in hopes that evidence can be developed at trial to support the claim.  T.W. Elec. Service Inc., 809 F.2d at

630.(relying on <u>Anderson</u>, *supra*).  Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 888-89 (1990).

B.      <u>Analysis</u>.

The court begins by noting that an inmate has no constitutional right to release before expiration of the sentence.  <u>Greenholtz v. Inmates of Nebraska</u>, 442 U.S. 1 (1979).  Nor have the Washington state appellate courts recognized an independent state created interest in amassing early release credits.  <u>In Re Galvez</u>, 79 Wash. App. 655 (1995).  This does not end the court's analysis because in this case the court is not concerned with the granting or denial of earned early release time.  Under the facts of this case the plaintiff had been granted the credits or time off his sentence and was eligible for release, subject to the approval of the release plan by the Department of Corrections and whatever public notification may be mandated by state law.

There are two questions this court must answer.  The first question is whether the Due Process Clause of the 14th Amendment requires a hearing prior to denial of a release plan and the second question is whether the law was clearly established that such a hearing was required.

The court cannot overemphasize that the interest at issue in this case must be a state created liberty interest and is not an interest found under the 14th Amendment Due Process Clause itself.  Normally the court would first determine whether there is in fact a state created liberty interest.  The Washington State Court of Appeals found there to be a "limited liberty interest" in <u>Crowder</u>, but the court did not define what a "limited liberty interest" is and approved post deprivation remedies which only included the Department helping Mr. Crowder to obtain release.  <u>In Re Crowder</u>, 97 Wash App. 598 (1999).  No hearing of any type was ordered.

In <u>Dutcher</u> the same court emphasized it was operating under the State Rule of Appellate Procedure 16.4 which did not require a finding of a constitutional violation and only required a finding of unlawful restraint under state law.  <u>Dutcher</u> 114 Wash. App. at FN 3 and 4; <u>Citing</u> <u>In Re Cashaw</u>, 123 Wash. 2d 138 (1994).  <u>Cashaw</u> specifically rejected the contention that procedural rules which are not outcome determinative create a liberty interest protected by Due Process. <u>In Re Cashaw</u>, 123 Wn 2d. at 146.  In <u>Cashaw</u> the Washington State Supreme Court required the Indeterminate Sentence Review Board

1    to follow its own rules and granted relief using the State Rule of Appellate Procedure 16.4.  This grant of

2    relief was not based on a  finding of any constitutional violation.

3            The Washington State Supreme Court in <u>Cashaw</u> was careful to grant relief only on state grounds.

4    Indeed, the State Supreme Court in <u>Cashaw</u> analyzed what is needed to find a state created liberty interest

5    and found no due process violation in that case.  The State Supreme Court's analysis in <u>Cashaw</u> is

6    instructive regarding what constitutes a liberty interest and when such interests rise to the level of a state

7    created liberty interest protected by the Due Process Clause of the United States Constitution.  This court

8    adopts the analysis set forth by the Washington State Supreme Court.  The court stated:

9            Liberty interests may arise from either of two sources, the due process clause and
        state laws. <u>Hewitt v. Helms</u>, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675
10       (1983); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1089 (9th Cir.1986), <u>cert. denied</u>, 481 U.S.
        1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The due process clause of the federal
11       constitution does not, of its own force, create a liberty interest under the facts of this case
        for it is well settled that an inmate does not have a liberty interest in being released prior to
12       serving the full maximum sentence. <u>Greenholtz v. Inmates of Nebraska Penal &</u>
        <u>Correctional Complex</u>, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); <u>Ayers</u>,
13       105 Wash.2d at 164-66, 713 P.2d 88; <u>Powell</u>, 117 Wash.2d at 202-03, 814 P.2d 635.

14           However, as indicated above, state statutes or regulations can create due process
        liberty interests where none would have otherwise existed. <u>See Hewitt</u>, 459 U.S. at 469,
15       103 S.Ct. at 870; <u>Toussaint</u>, 801 F.2d at 1089; <u>Powell</u>, 117 Wash.2d at 202-03, 814 P.2d
        635. By enacting a law that places substantive limits on official decisionmaking, the State
16       can create an expectation that the law will be followed, and this expectation can rise to the
        level of a protected liberty interest. <u>See Toussaint</u>, 801 F.2d at 1094.

17
            For a state law to create a liberty interest, it must contain "substantive predicates" to
18       the exercise of discretion and "**specific directives to the decisionmaker that if the**
        **regulations' substantive predicates are present, a particular outcome must follow**".
19       <u>Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910,
        104 L.Ed.2d 506 (1989); <u>Swenson v. Trickey</u>, 995 F.2d 132, 134 (8th Cir.), <u>cert. denied</u>,
20       510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 468 (1993). **Thus, laws that dictate particular**
        **decisions given particular facts can create liberty interests, but laws granting a**
21       **significant degree of discretion cannot.**

22   <u>In Re Cashaw</u>, 123 Wn 2d at 144 (emphasis added).

23           The Department has been mandated by statute to implement a system that allows for the possibility

24   of early release.  For some persons the release is automatic when they reach their earned early release date

25   because they have no supervision following incarceration. Inmates like Mr. Kistenmacher, facing

26   community placement or community custody, can earn a potential reduction in sentence and be placed on

27   community placement or community custody at the discretion of the Department of Corrections.

28           The parties may disagree whether the discretion of the Department is unfettered or restricted with

REPORT AND RECOMMENDATION
Page - 8

1   regards to what the department may consider but such argument misses the point.  RCW 9.94A.728(2)(d)

2   grants the Department the ability and the discretion to deny a release plan for any person who would

3   receive community custody if the Department determines the plan may violate conditions of a sentence or

4   supervision, may place the offender at risk to reoffend, or presents a risk to victim or community safety.

5   Thus, whatever limits have been placed on the Department are not outcome determinative and there is no

6   state created liberty interest.  The Department still has a significant degree of discretion in granting or

7   denying release to community placement or community custody.  As the statute itself notes "[t]he

8   department's authority under this section is independent of any court-ordered condition of sentence or statutory

9   provision regarding conditions for community custody or community placement."  (Dkt. # 25, Exhibit 3, page

10  3, RCW 9.94A.728 (2)(d)).

11          A careful reading of the Washington State Court of Appeals holding in <u>Dutcher</u> shows the court

12  was acting pursuant to state Rule of Appellate Procedure 16.4 and was using the lesser standard of review

13  which did not require a finding of a constitutional violation.  The ruling in <u>Dutcher</u> that the Department

14  must follow the state statutory system and consider plans on the merits does not equate to a finding of a

15  state created liberty interest in release and the holding in <u>Dutcher</u> did not eliminate the Departments

16  discretion.

17          There has been a progression in the State Court of Appeals decisions in which their terminology

18  and reasoning was expanding.  In <u>Crowder</u> the court found only a "limited liberty interest."  <u>In Re</u>

19  <u>Crowder</u>, 97 Wash. App. 598 (1999).  In <u>Dutcher</u>, the court used the reasoning of <u>Cashaw</u> to grant relief

20  solely on state grounds but inaccurately stated the interest was a "limited but protected liberty interest."

21  <u>Dutcher</u>, 114 Wash. App. at 758.  Now, in a more recent case, the same court is citing <u>Cashaw</u> and

22  <u>Dutcher</u> for the proposition that there is a limited liberty interest protected by due process.  <u>In Re Liptrap</u>,

23  127 Wash. App. 463, 469  (2005).  To the extent that <u>Liptrap</u>, finds a state created liberty interest in

24  release credits for persons subject to community custody the cases cited do not support the proposition and

25  the court declines to follow this decision.  A potential for release based on the Department exercising its

26  discretion does not equate to an absolute interest in release that a person with earned time and no post

27  release supervision enjoys.

28          As noted above neither <u>Crowder</u> nor <u>Dutcher</u> found a state created liberty interest.  Under the

REPORT AND RECOMMENDATION
Page - 9

Case 3:04-cv-05825-RBL   Document 37   Filed 03/09/06   Page 10 of 10

1    analysis set forth in <u>Cashaw</u> there is no federally protected interest in this case.  The holding of <u>Dutcher</u> is

2    that an agency follow its own rules and statutes.  While in some cases that may become outcome

3    determinative and raise to the level of a state created liberty interest it is not outcome determinative in this

4    case because of the amount of discretion left with the Department.

5          There is not a state created liberty interest at stake in this case.  The statutes creating the potential

6    of community custody do not set forth any mandate that the Department hold hearings and only mandate

7    the Department consider properly submitted release plans for persons who have reached their possible

8    earned early release date subject to community custody or community placement after release.

9    Accordingly the defendant's motion for summary judgment should be **GRANTED.**

10   CONCLUSION

11         For the reasons stated above the court should **GRANT** defendant's motion for Summary

12   Judgment.  A proposed order accompanies this Report and Recommendation.

13         Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the

14   parties shall have ten (10) days from service of this Report to file written objections.  *See also* Fed. R. Civ.

15   P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas v.</u>

16   <u>Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to

17   set the matter for consideration on **April 14th, 2006**, as noted in the caption.

19         DATED this 9th day of March, 2006.

24   Karen L. Strombom
25   United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 10